PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3931
_____

CITY SELECT AUTO SALES INC., a New Jersey
corporation, individually and as the representative of a class
similarly situated persons,
                                        Appellant

v.

BMW BANK OF NORTH AMERICA INC.;
BMW FINANCIAL SERVICES NA LLC;
CREDITSMARTS CORP.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-13-cv-04595)
District Judge: Honorable Noel L. Hillman
_____

ARGUED: January 25, 2017

Before: KRAUSE, SCIRICA, and FUENTES, *Circuit
Judges*.

(Filed: August 16, 2017)

Phillip A. Bock, Esq. [ARGUED]
Jonathan B. Piper, Esq.
Bock, Hatch, Lewis & Oppenheim, LLC
134 North La Salle Street
Suite 1000
Chicago, IL  60602

Alan C. Milstein, Esq.
Sherman, Silverstein, Kohl, Rose &  Podolsky, P.A.
308 Harper Drive
Suite 200, Eastgate Corporate Center
Moorestown, NJ  08057

     *Counsel for Appellant City Select Auto Sales, Inc.*

Ryan L. DiClemente, Esq.
Saul Ewing LLP
650 College Road East
Suite 4000
Princeton, NJ  08540

Raymond A. Garcia, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
38th Floor
New York, NY  10038

Julia B. Strickland, Esq. [ARGUED]
Stroock & Stroock & Lavan LLP

2029 Century Park East
Suite 1800
Los Angeles, CA  90067

   *Counsel for Appellees BMW Bank of North America,*
   *Inc., and BMW Financial Services NA, LLC.*

Thomas J. Gaynor, Jr. Esq.
Robert A. Smith, Esq.
Smith & Doran
60 Washington Street
Courthouse Plaza
Morristown, NJ  07960

William B. Hayes, III, Esq. [ARGUED]
257 Jackson Street
Denver, CO  80206

   *Counsel for Appellee Creditsmarts Corp*

Jonathan D. Hacker, Esq.
O'Melveny & Myers
1625 I Street NW
Washington, DC  20006

Hannah Y.S. Chanoine, Esq.
Anton Metlitsky, Esq.
7 Times Square
Time Square Tower, 33rd Floor
New York, NY 10036

*Counsel for Amicus Curiae The Chamber of Commerce of the United States of America and the Grocery Manufacturers Association*

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

In this Federal Rule of Civil Procedure 23(f) appeal, a New Jersey automobile dealership contests the denial of class certification of claims brought against the consumer financing division of BMW and its contractor for junk faxes allegedly sent in violation of the Telephone Consumer Protection Act. The District Court denied class certification on the sole ground that there was no reliable and administratively feasible means of determining whether putative class members fell within the class definition. We will vacate and remand.

## I.

Defendant Creditsmarts Corporation operates an internet-based "indirect business-to-business lending tree" that helps independent car dealers connect customers with various lenders. Dealers input customer information into Creditsmarts's online portal, Creditsmarts forwards the information to lenders based on the customer's credit profile and the automobile to be purchased, and lenders may, if

appropriate, approve a loan for the customer. Creditsmarts benefits dealers by providing customers with access to financing options to facilitate sales and benefits lenders by connecting them with potential borrowers at many small independent dealerships.

Defendants BMW Bank of North America, Inc., and BMW Financial Services NA, LLC (collectively "BMW") offer direct automotive financing to customers through a division called "up2drive." up2drive provides financing to borrowers at independent car dealers for all makes and models of cars.

In 2012, BMW and Creditsmarts entered into a contract, memorialized in a Master Professional Services Agreement and a Marketing Agreement, under which BMW would offer up2drive loans to borrowers at participating independent car dealers through the Creditsmarts system. Creditsmarts agreed to "establish electronic systems to permit customers to communicate with up2drive through mutually agreed secure lines of communication" and "process all application forms using the minimum credit parameters established by up2drive and the information obtained . . . from the application form including the customer's credit history, that will provide sufficient data to determine whether the customer may qualify for any loan programs offered . . . by up2drive." In exchange, Creditsmarts would receive compensation from BMW for customers referred to up2drive through its system. As part of the marketing agreement, BMW agreed to provide "general institution information (including logos or Trademarks) to be published on the Vendor web site (Creditsmarts.com)."

On a number of occasions in late 2012, Creditsmarts used the services of a fax broadcaster, WestFax, Inc., to fax advertisements to independent car dealers. The advertisements included the up2drive logo, identified BMW Bank of North America, and stated "UpToDrive is looking for your BUSINESS!!" A Creditsmarts employee used WestFax to successfully send 5,480 faxes on November 29, 2012; 5,107 faxes on December 4, 2012; and 10,402 faxes on December 27, 2012 (collectively "the BMW faxes").

To send each fax, the employee generated a list of recipients from Creditsmarts's customer database. The customer database contains dealership contact information, sometimes including fax numbers, as well as information regarding the dealership's relationship, if any, with Creditsmarts and the date the dealership was added to the database. After generating the recipient list from the customer database, the employee uploaded the list and the advertisement to Westfax's online portal. Westfax then broadcast the fax to each recipient and billed Creditsmarts for each fax successfully completed. Neither Creditsmarts nor Westfax retained the lists of recipients of the BMW faxes.

Plaintiff City Select Auto Sales, Inc., received one of the faxes sent on December 27, 2012. City Select alleges that it had no preexisting business relationship with Creditsmarts or BMW and that the fax was unsolicited.

On July 30, 2013, City Select filed a complaint in the United States District Court for the District of New Jersey asserting, *inter alia*, a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227, and a state law claim for conversion based on the BMW fax. In addition to its

6

individual claim, City Select asserted claims under Federal Rule of Civil Procedure 23 on behalf of a class of other car dealers who received the BMW faxes. City Select sought certification of a class defined as:

> All auto dealerships that were included in the Creditsmarts database on or before December 27, 2012, with fax numbers identified in the database who were sent one or more telephone facsimile messages between November 20, 2012 and January 1, 2013, that advertised the commercial availability of property, goods or services offered by "BMW Bank of North America."

During class certification discovery, City Select sought to compel production of the Creditsmarts database. The database was not preserved as of December 2012, but was preserved as of February 2014. City Select avers that class members can be identified from the 2014 database by determining those customers who were added to the database before December 2012 and who had fax numbers listed in the database. But City Select's motion to compel production of the Creditsmarts database was denied.[1]

---

[1] The motion to compel was referred to a Magistrate Judge, who denied the motion without prejudice because City Select agreed early in the case not to seek production of the database before a ruling on the motion for class certification, delayed seeking to compel production, and given the exemplars that had been provided, had not shown that disclosure of the entire database was needed to address the certification issue. The Magistrate Judge specifically stated that he was not ruling on

The District Court denied City Select's motion for class certification on the sole ground that the proposed class failed to meet our Circuit's ascertainability standard because there was no reliable and administratively feasible means of determining whether putative class members fell within the class definition. *City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, Civil Action No. 13-4595, 2015 WL 5769951, at

the relevance of the database or whether Creditsmarts's proprietary interests affected disclosure. City Select did not appeal this ruling to the District Court, or directly raise it before us. City Select explained at oral argument, however, that it did not appeal that ruling because it believed the gist of the database could be ascertained from the exemplar pages and it did not need the complete class list prior to certification, but only a method for identifying the class, which the exemplar adequately provided. The District Court, in turn, even assuming the exemplar was representative of the rest of the database, concluded that the City Select's class was not ascertainable. Although City Select's failure to challenge the Magistrate Judge's discovery ruling could be deemed a waiver absent exceptional circumstances, *Continental Cas. Co. v. Dominick d'Andrea, Inc.*, 150 F.3d 245, 252 (3d Cir. 1998), we conclude—in light of the procedural history here, the arguments City Select raised expressly contemplating production of the database if the class was deemed ascertainable based on the exemplar, and our own view of the centrality of the database—that even if City Select's objection were not preserved through its argument, we would be presented here with the type of exceptional circumstance that would allow us to address the production of the Creditsmarts database and to hold, as we do today, that its production is required.

*9 (D.N.J. Sept. 29, 2015); *see Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The Court concluded that "even though Plaintiff may be able to identify the potential universe of fax recipients, there is no objective way of determining which customers were actually sent the BMW fax." City Select appealed.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We granted plaintiff's petition for interlocutory appeal from the District Court's order denying class certification under Federal Rule of Civil Procedure 23(f) and have jurisdiction under 28 U.S.C. § 1292(e).

"We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (internal quotation marks omitted). We review the legal standard applied by the district court *de novo. Id.*

## III.

The question presented in this appeal is whether the District Court correctly determined that there was no reliable and administratively feasible means of determining whether putative class members were within City Select's proposed class definition. Because we conclude the District Court erred in its analysis of plaintiff's proposed method of determining class membership, we will vacate and remand.

Every putative class action must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). In addition to the Rule 23(a) requirements, a class action must be maintainable under Rule 23(b)(1), (2), or (3). Only Rule 23(b)(3) is at issue in this case, which requires plaintiff to meet the additional requirements of predominance and superiority. *Amchem*, 521 U.S. at 615.

A Rule 23(b)(3) class must also be "currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 593 (3d Cir. 2012).[2] To satisfy this standard, plaintiff must show that "(1) the class is 'defined with reference to objective criteria';[3] and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)). Plaintiff has

---

[2] The ascertainability standard is not applicable to Rule 23(b)(2) classes. *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).

[3] Under the objective criteria requirement, "[a] class definition that depends on subjective criteria, such as class members' state of mind, will fail for lack of definiteness." § 3:3.Tests for the definiteness requirement, Newberg on Class Actions § 3:3 (5th ed.); *see Chiang v. Veneman*, 385 F.3d 256, 698 (3d Cir. 2004) (concluding that "defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation").

the burden of making this showing by a preponderance of the evidence, and the district court must "undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera*, 727 F.3d at 306; *see In re Hydrogen Peroxide*, 552 F.3d at 318. However, plaintiff need not "be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)) (emphasis in *Byrd*).

We have articulated three principal rationales for this standard. First, "ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). "Second, it ensures that a defendant's rights are protected by the class action mechanism," *id.*, and that "those persons who will be bound by the final judgment are clearly identifiable," *Marcus*, 687 F.3d at 593. Finally, "it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action." *Carrera*, 727 F.3d at 307.

## A.

An examination of the various factual circumstances in which we have analyzed the ascertainability standard helps to demonstrate its contours. We first addressed this standard in *Marcus*, in which plaintiff proposed a class of New Jersey purchasers of BMW vehicles equipped with "run-flat tires" that had "gone flat and been replaced" during the class period. 687 F.3d at 592. This definition presented several serious ascertainability issues. First, the vehicles in question were manufactured by a foreign subsidiary who was not a party to

11

the action and thus defendant did not have access to records of which vehicles were equipped with the defective tires. *Id.* at 593. Second, dealerships regularly replaced the run-flat tires with regular tires, and plaintiff did not present a method of obtaining records from individual dealerships. *Id.* at 593–94. Finally, plaintiff limited the class to purchasers of BMWs whose tires had "gone flat and been replaced" and did not propose a method of determining who met this part of the class definition. *Id.* at 594. Because plaintiff left the answer to each of these questions to "potential class members' say so," we remanded to the District Court to consider "the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative." *Id.*

In *Hayes v. Wal-Mart Stores, Inc.*, we considered claims brought by a putative class of New Jersey retail discount club customers who purchased goods with extended warranties. 725 F.3d at 352. Plaintiff's proposed class definition included all customers who purchased a "Service Plan to cover as-is products" but excluded any customers whose "as-is product was covered by a full manufacturer's warranty, was a last-one item, consumers who obtained service on their product, and consumers who have previously been reimbursed for the cost of the Service Plan." *Id.* at 353. We noted that this class definition required a number of separate factual inquiries to determine class membership: "(1) whether a Sam's Club member purchased a Service Plan for an as-is item, (2) whether the as-is item was a 'last one' item or otherwise came with a full manufacturer's warranty, and (3) whether the member nonetheless received service on the as-is item or a refund of the cost of the Service Plan." *Id.* at 356. We remanded so that plaintiff could propose reliable and

12

administratively feasible methods of answering these questions without requiring "extensive and individualized fact-finding." *Id.*

In *Carrera*, the District Court certified a class composed of all purchasers of a particular over-the-counter diet supplement over several years in the state of Florida. 727 F.3d at 304. Defendants in that case were the drug manufacturers, and thus did not have access to any retailer records that could have established which customers purchased the drug during the requisite time period. *Id.* Plaintiff proposed using "retailer records of online sales and sales made with store loyalty or rewards cards" combined with affidavits from potential class members. *Id.* But plaintiff had not sought, nor obtained, the proposed records during class discovery. *Id.* at 308–09. We determined that it was inappropriate to certify the class without further inquiry into the nature and extent of the available records, and remanded in part for this purpose. *Id.* at 309. In addition, we noted that, even if the proposed records did exist, there was no evidence that a "single purchaser," let alone the whole class, could be identified using them. *Id.*. For these reasons, among others, we remanded so that plaintiff could conduct additional discovery into whether there was a reliable and administratively feasible means of determining class membership. *Id.* at 312.

Most recently, in *Byrd* we considered claims brought by people who leased computers with spyware that was installed and activated without their consent. 784 F.3d at 160. The class definition included both the lessees and their household members. *Id.* Defendants kept detailed records enabling identification of the lessees. *Id.* at 169. We

13

concluded that identification of the household members was unlikely to pose "serious administrative burdens that are incongruous with the efficiencies expected in a class action." *Id.* at 170 (quoting *Marcus*, 687 F.3d at 593). We explained "[a]ny form used to indicate a household member's status in the putative class must be reconciled with the 895 known class members or some additional public records." *Id.* at 171.

**B.**

In this case, we will vacate and remand for two reasons. First, our ascertainability precedents do not categorically preclude affidavits from potential class members, in combination with the Creditsmarts database, from satisfying the ascertainability standard. Second, because the Creditsmarts database was not produced during discovery, plaintiff was denied the opportunity to demonstrate whether a reliable, administratively feasible method of ascertaining the class exists based, in whole or in part, on that database.

Critically, the proposed class definition in this case is limited to "auto dealerships that were included in the Creditsmarts database on or before December 27, 2012." The first two principal policy rationales for the ascertainability standard—facilitating opt-outs and identifying persons bound by the final judgment—are not implicated in this case. Unlike the consumer classes in *Marcus*, *Hayes*, and *Carrera*, in which plaintiffs had not limited the proposed class definitions to the available records, the Creditsmarts database allows for notice directly to potential class members and limits the universe of potential claimants. Any recipients of the BMW faxes who are not included in the Creditsmarts database would not be bound by a hypothetical judgment. *See Byrd*,

14

784 F.3d at 167 ("Individuals who are injured by a defendant but are excluded from a class are simply not bound by the outcome of that particular action.").

The District Court concluded that the class was nonetheless not certifiable because the Creditsmarts database was over-inclusive, and thus it would be impossible to identify class members in a reliable and administratively feasible way. The Court explained,

> It is clear from the record that the list of recipients of the BMW fax was generated from the Creditsmarts database, and although the database was not preserved until February 2014, it appears that the parties can determine from the database those customers that were also on the list in December 2012. From this subset of customers, the parties can eliminate those customers who could not have been sent the fax because no fax number was contained in the database. However, there is no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant time period.

This determination was based, in part, on Creditsmarts's representation that its database included more entries than the number of BMW faxes sent in the three batches. The District Court concluded "there is no objective way of determining which customers were actually sent the BMW fax" using the Creditsmarts database alone.

To the extent this conclusion was based on a

15

categorical determination that the Creditsmarts database in combination with affidavits from potential class members could never satisfy the ascertainability standard, we disagree. Plaintiff need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership. *Byrd*, 784 F.3d at 163. Rule 23 does not require an objective way of determining class membership at the certification stage, but only that there be "objective criteria" for class membership and a "reliable and administratively feasible" means of determining whether these criteria are met. *Id.*

Affidavits from potential class members, standing alone, without "records to identify class members or a method to weed out unreliable affidavits," will not constitute a reliable and administratively feasible means of determining class membership. *Byrd*, 784 F.3d at 171. However, *Marcus* and our other cases do not imply "*no* level of inquiry as to the identity of class members can ever be undertaken." *Id.* Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard. *Id.* at 170–71. The conclusion that affidavits in combination with the Creditsmarts database categorically failed to meet the ascertainability standard was inconsistent with these precedents.

Here, the Creditsmarts database defines a limited set of potential claimants. The only factual inquiry required to determine class membership is whether a particular dealership in the database received the BMW fax on one of the dates in question. Answering this factual question of identification through affidavits or other available records does not necessarily require individualized fact-finding that would be

16

"administratively infeasible" or "a violation of Defendants' due process rights." *See Byrd*, 784 F.3d at 170.

We take no position on whether the level of individualized fact-finding in this case is administratively infeasible because we are limited by the record before us, which does not include the Creditsmarts database. The determination whether there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition must be tailored to the facts of the particular case. The amount of over-inclusiveness, if any, of the proposed records is a critical consideration.[4]

The District Court's conclusion that "there is no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant time period" cannot be supported on this record. Without production of the database, there was no evidence in the record of the number of customers who both had fax numbers and were in the database as of December 2012. On appeal, Creditsmarts avers that its database includes "as many as 31,000 auto dealerships," but does not offer any information about how many of those dealerships had fax numbers and were added prior to the relevant period. In addition, City

---

[4] Even if it is true that the BMW fax was not sent to every customer who had a fax number in the database during the relevant time period, the class could still be certified, so long as there is a method for determining which customers *did* receive such faxes, which could be by affadavit. While a high degree of over-inclusiveness could prevent certification, any degree of over-inclusiveness will not do so.

17

Select was denied an opportunity to review the information in the Creditsmarts database to determine if it could be used as part of a reliable and administratively feasible means to determine class membership, combined with other records, with affidavits, or otherwise.

Without further information about the Creditsmarts database, there was not an adequate record on which to base the conclusion that the class was not ascertainable based on a "reliable and administratively feasible mechanism." *Byrd*, 784 F.3d at 163.[5] We will remand so that the Creditsmarts

[5] As noted above, the District Court, even after assuming the database could be filtered to reflect the customers in the database during the appropriate time period, stated "there is no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant time period." That finding does not appear to be consistent with the record, which contains significant circumstantial evidence that the faxes were sent to every customer in the database at that time. For example, after the faxes went out, Creditsmarts's CEO emailed BMW explaining that the "the employee who sent the email out to our registered dealer list" did it without authorization, and, at his deposition, the CEO testified that he understood the fax to be a "program update"—that is, an update meant to provide Creditsmarts's "list of 31,000 auto dealerships that have registered to receive information regarding finance programs and compliance" with information that they "need[] to know when discussing finance options with their customers." On remand, the District Court should consider this evidence in assessing whether the relevant portion of the database coupled with attestations satisfies our ascertainability standard.

database can be produced, subject, if appropriate, to a protective order and any other necessary provisions for confidentiality of Creditsmarts's business information.

## IV.

Because the District Court erred in applying the ascertainability standard, we will vacate and remand for further consideration in accordance with this opinion.

**City Select Auto Sales Inc. v. BMW Bank of North America Inc. et al.**
**No. 15-3931**

_____

FUENTES, *Circuit Judge*, concurring:

I agree that under our existing precedent, City Select must be given an opportunity to demonstrate, using the Creditsmarts database and affadavits from potential class members, that there is a reliable and administratively feasible means to determine whether putative class members fall within the class definition. I write separately because this case highlights the unnecessary burden on low-value consumer class actions created by our circuit's adoption of a second ascertainability requirement. The Second, Sixth, Seventh, and Ninth Circuits have all rejected this additional requirement, and we should do so as well.[1]

Our ascertainability inquiry is a creature of common law. Historically, it referred only to the requirement that a class be defined with reference to objective criteria. But in

_____

[1] *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 172 (3d Cir. 2015) (Rendell, J., concurring) ("[T]he lengths to which the majority goes in its attempt to clarify what our requirement of ascertainability means, and to explain how this implicit requirement fits in the class certification calculus, indicate that the time has come to do away with this newly created aspect of Rule 23 in the Third Circuit. Our heightened ascertainability requirement defies clarification. Additionally, it narrows the availability of class actions in a way that the drafters of Rule 23 could not have intended.").

1

2012, in *Marcus v. BMW of North America, LLC*,[2] we for the first time added a second requirement: that a plaintiff must show a "reliable, administratively feasible" mechanism to identify class members. Since our adoption of this new requirement, circuits that have carefully considered whether to adopt our new requirement have declined to do so.[3]

---

[2] 687 F.3d 583, 594 (3d Cir. 2012).

[3] The Fourth Circuit applied a version of the two-requirement definition of ascertainability without analyzing the adoption of this second requirement. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). The Eleventh Circuit has applied it in unpublished opinions.

However, the Second, Sixth, Seventh, and Ninth Circuits have all expressly rejected it. *See In re Petrobras Sec.*, No. 16-1914-CV, 2017 WL 2883874, at \*9 (2d Cir. July 7, 2017) ("With all due respect to our colleagues on the Third Circuit, we decline to adopt a heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage . . . [, which] would upset the careful balance of competing interests codified in the explicit requirements of Rule 23."); *Rikos v. Procter & Gamble Co*., 799 F.3d 497, 525 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493 (2016) ("We see no reason to follow *Carrera*, particularly given the strong criticism it has attracted from other courts."); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015), *cert. denied*, 136 S.Ct. 1161 (2016); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017). In a recent opinion, the Sixth Circuit considered adopting the added definition of ascertainability, but ultimately found it unnecessary to reach this issue. *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, In*c., No. 16-3741, 2017 WL 2953039, at \*4 (6th Cir. July 11, 2017) ("[T]he district court's recognition of the difficulty in identifying class members without fax logs and with sole reliance on individual affidavits was equally sufficient to preclude certification, regardless of whether this concern is properly articulated as part of ascertainability, Rule 23(b)(3) predominance, or Rule 23(b)(3) superiority.").

As the majority explains,[4] *Marcus* and the cases interpreting it have identified three values purportedly served by this additional ascertainability requirement—to protect:

> **(1)** absent plaintiffs' opt-out rights and interest in not having future claims diluted,[5]

---

The Eighth Circuit rejects the ascertainability requirement all together. *See Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) ("[T]his court has not addressed ascertainability as a separate, preliminary requirement. Rather, this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'").

In response to the Ninth Circuit's decision, ConAgra has petitioned the Supreme Court for certiorari, seeking to have the Court decide whether there must be a reliable, administratively feasible method for identifying class members for a class to be certified. That petition is currently pending before the Court.

[4] Maj. Op. at 11.

[5] *See Marcus*, 687 F.3d at 593 (explaining that this requirement "protects absent class members by facilitating the 'best notice practicable' under Rule 23(c)(2) in a Rule 23(b)(3) action"). *See also Carrera v. Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013) ("It is unfair to absent class members if there is a significant likelihood their recovery will be diluted by fraudulent or inaccurate claims.").

4

**(2)** a defendant's due process rights,[6] and

**(3)** the efficiency of the class action mechanism.[7]

In my view, the added ascertainability requirement is not necessary to serve any of these values. They are already sufficiently protected by the existing requirements of Rule 23, including Rule 23(b)(3) predominance and Rule 23(b)(3) superiority. Moreover, it undermines the "very core" of cases that the class action device was designed to bring to court:

---

[6] *Marcus*, 687 F.3d at 593-94 (explaining that this requirement "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable"). *See also Carrera*, 727 F.3d at 310 ("Bayer too has an interest in ensuring it pays only legitimate claims. If fraudulent or inaccurate claims materially reduce true class members' relief, these class members could argue the named plaintiff did not adequately represent them because he proceeded with the understanding that absent members may get less than full relief. When class members are not adequately represented by the named plaintiff, they are not bound by the judgment. They could then bring a new action against Bayer and, perhaps, apply the principles of issue preclusion to prevent Bayer from re-litigating whether it is liable under the [statute]. Bayer has a substantial interest in ensuring this does not happen." (internal citations omitted)).

[7] *See Marcus*, 687 F.3d at 593 (explaining that this requirement "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members." (internal quotations and citations omitted)).

5

cases where many consumers have been injured, but none have suffered enough to make individual actions possible.[8] In those cases, as in this case, the realistic options are collective action or no redress for grievances at all.

### 1. Absent Plaintiffs' Opt-Out Rights and Interests

The additional requirement is apparently intended to protect absent class members by facilitating the "best notice practicable" requirement in a Rule 23(b)(3) action. This is said both to prevent absent class members' recovery from being "diluted" by fraudulent or inaccurate claims, and to allow potential class members to opt out of the class.

First, the dilution concern misses the mark on the reality of the consumer class action landscape. Only a tiny fraction of eligible class members ever submit to class administrators in consumer cases.[9] And "[t]he chances that someone would, under penalty of perjury, sign a false affidavit stating that he or she bought Bayer aspirin for the

---

[8] *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (Rakoff, J.).

[9] *See Carrera v. Bayer Corp.*, No. 12-2621, 2014 WL 3887938 (3d Cir. May 2, 2014) (denial of petition for rehearing *en banc*), Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 9 (noting the "low historic claims rates" that make it unlikely that there would ever be a significant risk of dilution); Geoffrey C. Shaw, Note, Class Ascertainability, 124 Yale L.J. 2354, 2371 (2015) ("[O]f course it is common for only a fraction of the class members to ever file claims.").

sake of receiving a windfall of $1.59 are far-fetched at best."[10] In any case, courts have tools to identify and screen out fraudulent claims at the claims administration stage, as they can rely on "claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques . . . to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy."[11] Even if fraudulent claims are submitted, given the low participation rate generally, this is unlikely to result in dilution.[12] This dilution concern is also inconsistent with our Court's acceptance of *cy pres* remedies in class actions, allowing the distribution of unclaimed class action damages to

---

[10] *Byrd*, 784 F.3d at 175 (Rendell, J., concurring). *See also Briseno*, 844 F.3d at 1130 ("Why would a consumer risk perjury charges and spend the time and effort to submit a false claim for a de minimis monetary recovery?").

[11] *Mullins*, 795 F.3d at 667.

[12] *Id.* ("It is of course theoretically possible that the total sum claimed by non-deserving claimants exceeds the total amount of unclaimed funds, in which case there would be dilution, but given the low participation rates actually observed in the real world, this danger is not so great that it justifies denying class certification altogether, at least without empirical evidence supporting the fear.").

non-class members.[13]

Second, the concern about an absent plaintiff's notice and opt-out rights are also misplaced. Rule 23 does not require actual notice to all potential class members. Instead, Rule 23(c)(2)(B) requires the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Thus, the rule as written "recognizes it might be *impossible* to

---

[13] *Briseno*, 844 F.3d at 1129. The *cy pres* doctrine has been applied to class actions to allow courts to distribute unclaimed class action damages to charitable organizations in certain situations. *See* § 12:32.Cy pres—Generally, Newberg on Class Actions § 12:32 (5th ed.); *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013) ("We join other courts of appeals in holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury.").

identify some class members for purposes of actual notice."[14] In recognition of this impossibility, courts permit notice through third parties, advertising, and/or posting in places frequented by class members.[15] Moreover, these concerns about an absent plaintiff's rights are beside the point, where class actions are the *only* realistic means of vindicating a

---

[14] *Mullins*, 795 F.3d at 665. *See also Byrd*, 784 F.3d at 175 (Rendell, J., concurring) ("Rule 23 requires the 'best notice that is practicable under the circumstances' to potential class members after a class has been certified. Potential difficulties in providing individualized notice to all class members should not be a reason to deny certification of a class. As the Supreme Court noted in *Phillips Petroleum Co. v. Shutt*s, due process is satisfied when notice is 'reasonably calculated' to reach the defined class. 472 U.S. 797, 812 (1985). The question is not whether every class member will receive actual individual notice, but whether class members can be notified of their opt-out rights consistent with due process.").

[15] *Mullins*, 795 F.3d at 665. *See also Briseno*, 844 F.3d at 1129 ("Courts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process.") (citing *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013) (holding that sticker notices on two allegedly offending ATMs, as well as publication in the state's principal newspaper and on a website, provided adequate notice to class members in an action challenging ATM fees); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1319 (11th Cir. 2012) (holding that notice to unidentified class members by periodical and website satisfied due process)).

consumer's rights.[16] Thus, by denying class certification based on a fear that a prospective plaintiff will not be given notice to opt out and bring his own individual claim, we, "in effect, deprive potential class members of *any* recovery as a means to ensure they do not recover too little."[17] As Judge Posner put it, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."[18]

## 2. Defendants' Due Process Rights

---

[16] *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974) ("Economic reality dictates that petitioner's suit proceed as a class action or not at all.").

[17] *Carrera*, Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 9. *See also Briseno*, 844 F.3d at 1129 ("Practically speaking, a separate administrative feasibility requirement would protect a purely theoretical interest of absent class members at the expense of any possible recovery for all class members—in precisely those cases that depend most on the class mechanism. Justifying an administrative feasibility requirement as a means of ensuring perfect recovery at the expense of any recovery would undermine the very purpose of Rule 23(b)(3)—'vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation marks and citations omitted)).

[18] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

As a second justification, our Court has also explained that the added ascertainability requirement protects defendants by (1) ensuring that the plaintiffs bound by the final judgment are clearly identifiable, and (2) securing their due process rights to raise individual defenses and challenges.

These arguments, however, are flawed. The first requirement of the ascertainability test, that a class must be defined in reference to objective criteria, already allows courts to determine whether a plaintiff in a future action was a member of a prior class and thus is precluded from relitigation.[19] A court can plainly read the class definition and make this determination.

As to a defendant's due process rights, defendants may challenge a class member's inclusion in the class and individual damages later in the litigation.[20] A defendant may prefer to bring these challenges prior to class certification,

---

[19] *Briseno*, 844 F.3d at 1130 n. 9 ("If a future plaintiff were to assert a claim challenging the "100% Natural" label on Wesson oil purchased during the class period in one of the eleven states at issue, that would show that she was a member of the class bound by the judgment. This would be so regardless of how 'administratively feasible' it was to prove the entirety of the membership at the class certification stage in this action.") (citing Shaw, Note, Class Ascertainability, 124 Yale L.J. at 2374-78).

[20] *Mullins*, 795 F.3d at 671 ("As long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected.").

long before the damages stage or the settlement claims administration stage. But a defendant does not have a due process right to the most "*cost-effective*" method for challenging individual claims to class membership and damages, and these challenges are more appropriately addressed after certification.[21] Thus, the advisory committee notes to Rule 23 specifically contemplate that certification may be proper "despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class."[22]

### 3. Efficiency

Finally, the added ascertainability requirement is said to eliminate administrative burdens that are inconsistent with

---

[21] *Briseno*, 844 F.3d at 1132. *See also Mullins*, 795 F.3d at 669 ("It is certainly true that a defendant has a due process right not to pay in excess of its liability and to present individualized defenses if those defenses affect its liability. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364-65 (2011). It does not follow that a defendant has a due process right to a *cost-effective* procedure for challenging every individual claim to class membership.") (citing *American Express Co. v. Italian Colors Restaurant*, 133 S.Ct. 2304, 2309 (2013) ("the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim")). This is particularly true in cases where the size of the class does not change the size of the potential damage award.

[22] Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment.

the efficiency that class actions are intended to generate.

Not so. The superiority consideration explicitly required by Rule 23(b)(3) already requires courts to consider the efficiencies of the class action mechanism before certifying a class. Specifically, Rule 23(b)(3) requires that the class device be "superior to other available methods for fairly and efficiently adjudicating the controversy" and considers "the likely difficulties in managing a class action." Thus, imposing a separate manageability requirement within ascertainability "renders the manageability criterion of the superiority requirement superfluous."[23]

Furthermore, the superiority requirement requires courts to weigh the costs *and* benefits of certification.[24] The heightened ascertainability requirement, however, forces courts to consider the costs "in a vacuum"[25] without considering the realistic alternatives available to plaintiffs for

---

[23] *Mullins*, 795 F.3d at 663 (citing Daniel Luks, Note, Ascertainability in the Third Circuit: Name That Class Member, 82 Fordham L.Rev. 2359, 2395 (2014)).

[24] *Id.* at 663-64 (citing 7AA Wright et al., Federal Practice & Procedure § 1780 ("Viewing the potential administrative difficulties from a comparative perspective seems sound and a decision against class-action treatment should be rendered only when the ministerial efforts simply will not produce corresponding efficiencies. In no event should the court use the possibility of becoming involved with the administration of a complex lawsuit as a justification for evading the responsibilities imposed by Rule 23.")).

[25] *Id.* at 663.

13

bringing their claims. In truth, in many low value consumer class actions, "other available methods" of vindicating a plaintiff's rights will not exist.[26] A district court applying our existing ascertainability precedent is forced to ignore this reality.

Moreover, this requirement understates the ability of district courts to manage their cases and engineer solutions at the claims administration stage.[27] It prevents the district court from "wait[ing] and see[ing] how serious [a] problem may turn out to be after settlement or judgment, when much more may be known about available records, response rates, and

---

[26] Even if plaintiffs could realistically bring individual suits instead, I cannot see what efficiencies are promoted by requiring numerous actions adjudicating the same legal and factual issues for a small amount of damages each. *See Carnegie*, 376 F.3d at 661 ("The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30.").

[27] *Carrera*, Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 7-8 ("[T]he panel decision conflates class certification with the claims administration stage of the proceedings. The 'efficiencies' that are promoted by identifying individual class members plainly relate to the claims administration stage. It is in connection with the allocation of damages between and among class members that there is a need to ascertain the identities of those individual members.").

other relevant factors."[28] And decertification remains an option if manageability concerns overtake the efficiency of the class action. The mere fact that a case is complicated or time-consuming should not sound the death knell for certification.

\* \* \*

In short, our heightened ascertainability requirement creates an unnecessary additional burden for class actions, particularly the low-value consumer class actions that the device was designed to allow.[29]

---

[28] *Mullins*, 795 F.3d at 664. *See also Byrd*, 784 F.3d at 175 (Rendell, J., concurring) ("Imposing a proof-of-purchase requirement does nothing to ensure the manageability of a class or the 'efficiencies' of the class action mechanism; rather, it obstructs certification by assuming that hypothetical roadblocks will exist at the claims administration stage of the proceedings.").

[29] *Carrera*, No. 12-2621, 2014 WL 3887938, at \*1 (Ambro, J., dissenting from denial of petition for rehearing *en banc*) ("Several *amici*—including this country's most recognized expert on procedure, Arthur Miller—warn that *Carrera* threatens the viability of the low-value consumer class action 'that necessitated Rule 23 in the first instance.'" (quoting Br. of Amici Curiae Professors of Civil Procedure & Complex Litigation at 3)). *See also Byrd*, 784 F.3d at 176 (Rendell, J., concurring) ("The policy concerns animating our ascertainability doctrine boil down to ensuring that there is a surefire way to get damages into the hands of only those individuals who we can be 100% certain have suffered injury,

This appeal arises because Westfax failed to retain records of the recipients of the alleged junk faxes. Our heightened ascertainability requirement encourages that practice. Had the Defendants not retained a version of the Creditsmarts database, Plaintiffs would likely have been unable to meet the ascertainability requirement as we have interpreted. Congress passed the Telephone Consumer Protection Act to discourage the sending of junk faxes. Our additional ascertainability requirement threatens to render this and other consumer protection statutes ineffective by creating loopholes for defendants who fail to retain customer records.

We should join the Second, Sixth, Seventh, and Ninth Circuits in rejecting our added ascertainability requirement. We should return to our original interpretation of ascertainability under Rule 23, and require only that a class be defined in reference to objective criteria. I agree with Judge Rendell in her critique that "[u]ntil we revisit this issue as a full Court or it is addressed by the Supreme Court or the Advisory Committee on Civil Rules, we will continue to administer the ascertainability requirement in a way that

and out of the hands of those who may not have. However, by disabling plaintiffs from bringing small-value claims as a class, we have ensured that other policy goals of class actions—compensation of at least some of the injured and deterrence of wrongdoing, for example—have been lost. In small-claims class actions like *Carrera*, the real choice for courts is between compensating a few of the injured, on the one hand, versus compensating none while allowing corporate malfeasance to go unchecked, on the other.").

16

contravenes the purpose of Rule 23 and, in my view, disserves the public."[30]

---

[30] *Byrd*, 784 F.3d at 177 (Rendell, J., concurring).